UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAYMENTONE CORPORATION,

       Plaintiff,

    v.

PAYPAL, INC.,

       Defendant.

Case No.: 11-cv-02186-YGR

**CLAIM CONSTRUCTION ORDER**

PaymentOne Corporation ("PaymentOne") alleges infringement of three patents: (1) U.S. Patent No. 7,080,049 ("'049 Patent"); (2) U.S. Patent No. 7,848,500 ("'500 Patent"); and (3) U.S. Patent No. 7,848,504 ("'504 Patent") (collectively, "PaymentOne's Patents"). PayPal, Inc. ("PayPal") filed a counterclaim seeking a declaration of non-infringement and invalidity for each of PaymentOne's Patents, and alleging infringement of its own patent, U.S. Patent No. 5,757,917 ("'917 Patent" or "PayPal's Patent"). In response to PayPal's infringement claim, PaymentOne counterclaimed seeking a declaration of invalidity and non-infringement of PayPal's Patent.

The parties request that the Court construe nine claim terms/phrases from the four patents-in-suit. On October 5, 2012, the parties provided a technology tutorial. (Dkt. No. 119.) The Court held a claim construction hearing on December 19, 2012. (Dkt. No. 128.)

Based upon the papers submitted, the arguments of counsel, and for the reasons set forth below, the Court provides the following claim construction.

# I.   TERMS/PHRASES REQUESTED FOR CONSTRUCTION

The parties seek construction of the following claim terms/phrases:

| No. | DISPUTED CLAIM TERM/PHRASE |
|---|---|
| (1) | "communication line" |
| (2) | "subscriber line" |
| (3) | "wherein payment is routed to financial card gateway if a validation module invalidates the transaction" / "selectively route processing of the transaction to a financial instrument gateway in the event of a validation process not validating the subscriber line" |
| (4) | "financial card gateway" / "financial instrument gateway" |
| (5) | "automatically detecting an event indicative of an option to charge the second transaction to the user using an alternative payment method" / "to detect, automatically, an event indicative of an option to charge the second transaction to the user using an alternative payment method" |
| (6) | "billing telephone number (BTN)" / "BTN" |
| (7) | "determine [first/second] reference subscriber data" |
| (8) | "the first reference subscriber data corresponds to the second reference subscriber data" / "the second subscriber data corresponding to the first reference subscriber data" |
| (9) | "secure part of said computer system" |

(Amended Joint Claim Construction Statement & Prehearing Statement ["Am. Joint CC Statement" (Dkt. No. 123)] at 3–7.)

To date, the parties have agreed to the construction of certain terms/phrases.[1]  (Am. Joint CC Statement at 2; Reporter's Transcript of Proceedings dated Dec. 19, 2012 ["Transcript" (Dkt. No. 128)] at 93.)  The parties have provided a list of additional terms not requiring construction at this time.  (Am. Joint CC Statement at 8–9.)[2]

---

[1] Specifically, the parties stipulate that: (1) "automatically" means "without human intervention"; (2) "wherein the second database is distinct from the first database" means "wherein the first and second databases are separate databases"; (3) "first [/second] database" does not require construction; and (4) "comparing the first reference subscriber data to the second reference subscriber data" and "compare the first reference subscriber data to the second reference subscriber data" shall be given their ordinary meaning.

[2] The Court previously issued an order stating that it would construe no more than fourteen terms at claim construction—six joint terms and an additional four terms per party.  (Dkt. No. 95.)  In their

United States District Court
Northern District of California

## II.    RELEVANT FRAMEWORK FOR CLAIM CONSTRUCTION

Claim construction is a matter of law to be decided by the Court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996) (Determination of infringement is a two-step analysis: first, the Court determines the scope and meaning of the claims; second, the properly construed claims are compared to the accused device.).  "[T]he role of a district court in construing claims is . . . to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence."  *American Piledriving Equipment, Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011).  "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Thus, claim terms need only be construed "to the extent necessary to resolve the controversy."  *Wellman, Inc. v. Eastman Chemical Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) (citing *Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).[3]

The starting point in a claim construction analysis is the language of the claims themselves. These define the invention that the patentee may exclude others from practicing.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  The general rule is to construe a claim term in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312.

---

Am. Joint CC Statement, the parties stated that "[t]he remaining disputed terms are reserved for future hearings."  The Court notes it has not authorized any additional claim constructions in this action.

[3] Once the meaning of a term used in a claim has been determined, the same meaning applies to that term for all claims in which the same term appears.  *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).  After a term is construed, the Court's construction becomes the legally operative meaning of the disputed terms that governs further proceedings in the case.  *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005).  However, "district courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."  *Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010).

"There are only two exceptions to this general rule [that a claim term has its ordinary and customary meaning]: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996)). "[A] claim term also will not have its ordinary meaning if the term 'chosen by the patentee so deprive[s] the claim of clarity' as to require resort to the other intrinsic evidence for a definite meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) (quoting *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999)).

Claims must be read in view of the specification, of which they are a part and in a manner consistent with the patent's specification. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The specification may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* The Court also should consider the patent's prosecution history, if it is in evidence. *Id.* at 980. The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics Corp.*, 90 F.3d at 1582–83); *see also Chimie*, 402 F.3d at 1384 ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

Various doctrines of claim construction are implicated by the parties' arguments below. "'[C]laim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006); *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *see Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) (claim differentiation means that limitations stated in dependent claims are not to be read into the independent claim from which they depend).

United States District Court
Northern District of California

"[R]eading an additional limitation from a dependent claim into an independent claim would not only make that additional limitation superfluous, it might render the dependent claim invalid." *Curtiss-Wright*, 438 F.3d at 1380.

"Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (citing *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372–73 (Fed. Cir. 2005) and *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–26 (Fed. Cir. 2003)). A patentee may disavow the scope of the meaning of a claim term by, for example, clearly characterizing the invention in a way to try to overcome rejections based on prior art. *See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (limiting the term "transmitting" to require direct transmission over telephone line because the patentee stated during prosecution that the invention transmits over a standard telephone line, thus disclaiming transmission over a packet-switched network).[4] Where the patentee has unequivocally disavowed a certain meaning to obtain the patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender. *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 *supplemented sub nom. Cordis Corp. v. Boston Scientific Corp.*, 275 F. App'x 966 (Fed. Cir. 2008) ("an applicant can make a binding disavowal of claim scope in the course of prosecuting the patent, through arguments made to distinguish prior art references") (citing *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376 (Fed. Cir. 1999); and *Litton Sys., Inc., v. Honeywell Inc.*, 140 F.3d 1449, 1458 (Fed. Cir. 1998)).

---

[4] *See Alloc v. Int'l Trade Comm'n*, 342 F.3d 1361, 1372 (Fed. Cir. 2003) (finding the patentee expressly disavowed floor paneling systems without "play" because the applicant cited the feature during prosecution to overcome prior art); *Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) (limiting operation of the "transceiver" to the three stated modes because of clearly limiting statements made by the patentee to try to overcome a prior art rejection).

5

### III. PAYMENTONE'S PATENTS: CLAIM CONSTRUCTION ANALYSIS

#### A. First and Second Claim Terms/Phrases – "communication line" ('049 Patent, claims 8 & 9) and "subscriber line" ('049 Patent, claims 9 & 22)

The parties' dispute on these terms focuses on whether it is appropriate to limit "communication line" and "subscriber line" to a physical connection by wire or cable, or whether the connection may be wireless. The parties' proposed constructions are shown below with the key differences emphasized:

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
|---|---|---|
| communication line | a communication channel that facilitates **wireless or physical communication** between a vendor and an electronic terminal over a **wireless or physical** communication network | a **wire or cable** for which a customer has an **account with a local telephone company that physically connects** the customer's electronic terminal to the **local telephone company** |
| subscriber line | a communication channel in the form of a user's **wireless communication line, digital subscriber line, or cable line** that facilitates **wireless or physical communication** between a vendor and an electronic terminal over a **wireless or physical** communication network | a **telephone wire or cable** for which a customer has an **account with a local telephone company that physically connects** the customer's telephone or personal computer to the **local telephone company** |

#### 1. Parties' Positions

PaymentOne argues that based on the plain meaning of the terms, the teachings of the specification, and the doctrine of claim differentiation, neither term is limited to a "wire or cable" that "physically connects" a customer's electronic terminal to the local telephone company. The Court outlines each of PaymentOne's three principal arguments in turn:

First, the express language of independent claims 8 and 22 does not restrict the meaning to landlines, telephone lines, cables, or any form of a wire connection. PaymentOne concedes that the "communication line" or "subscriber line" *can be* a cable or wire connection, but it need not be. A person of ordinary skill in the art ("POSITA") in 2001 would have understood it can be either

6

wireless or wired, and the word "line" itself has a plain and ordinary meaning that includes both groups.

Second, PaymentOne argues the express language in the specification teaches that the electronic terminal (item 24 in Fig. 1, reproduced below) from which a consumer initiates a transaction may be a cellular telephone.  The specification at 64:28–33 provides: "In alternative embodiments, the machine may comprise a network router, a network switch, a network bridge, Personal Digital Assistant (PDA), *a cellular telephone*, a web appliance or any machine capable of executing a sequence of instructions that specify actions to be taken by that machine."  (Emphasis supplied.)  Thus, communications may logically and technically occur over a wireless network.  PaymentOne argues that a POSITA would recognize from this explicit teaching that communications may be wireless.



Further support in the specification exists for a broad construction of an electronic terminal because the specification describes a PC as an "exemplary form[]" of a computer system that could execute the instructions therein.  (*See* '049 Patent, 66:24–28.)  In other words, the patent specification contemplates that many machines can be item 24 and the Court cannot impose one embodiment (that which is connected to the local phone company) from the specification as a limitation to claims across the board.

Third, the doctrine of claim differentiation precludes a limitation to a telephone connection in independent claim 8 based on qualifying language in dependent claim 9.  These claims provide:

| Claim 8 | Claim 9 |
|---|---|
| A transaction processing system for processing a transaction between a vendor and an electronic terminal connected via a **communication line** to a communication network, the system including:<br><br>an application interface for providing a user, via the electronic terminal used to carry out the transaction, with an option to select payment for the transaction from an account associated with the **communication line** to which the electronic terminal is connected, and receiving a user request entered into the terminal to process payment from the account; and<br><br>a modification module connected to the application interface, the modification module generating a record which includes a unique identifier associated with the **communication line** and communicating the record to a validation module which validates the transaction based on data associated with the unique identifier, wherein payment is routed to financial card gateway if a validation module invalidates the transaction. | A system as claimed in claim 8, in which the **communication line** is a **subscriber line** and the unique identifier is a **telephone number associated with the subscriber line**. |

(Emphasis supplied.)

Reading claims 8 and 9 together, PaymentOne argues that an association with a telephone number cannot be imported to the broader "communication line" of claim 8. Further, if the patentee had wanted to "associate" a "telephone account" with a communication or subscriber line, it knew how to use such language in the claims. (*Compare* '049 Patent, claim 8 ("an account associated with the communication line to which the electronic terminal is connected") *with* claim 9 ("telephone number associated with the subscriber line").)[5]

PayPal argues that PaymentOne's proposed construction cannot be correct because the underlying premise for the '049 Patent and the teachings therein necessarily require a landline and did not include wireless. PayPal raises three principal arguments in support: first, PayPal argues that

---

[5] PaymentOne also argues that the inclusion of similar qualifications in other claims show that a limitation to a "telephone" could very well have been added if the patentee had so intended. (*See* '049 Patent, claims 17 ("telephone account associated with a subscriber line"), 21 ("an account associated with the subscriber line") & 27 ("a telephone account associated with the subscriber line").)

the '049 Patent was directed to "bill-to-landline"—that is, it purported to allow consumers making transactions via the internet to charge their home telephone number rather than a credit card.  (*See* '049 Patent, 4:59–64 ("[M]any users are unwilling to submit financial card information to vendors, inter alia, for security reasons.  Further, many users who have access to the Internet do not in fact possess financial cards (hereinafter referred to as credit cards) and are thus unable to transact via the Internet.").)  In order to provide greater security, "various checks" would be performed to validate the "subscriber line."  ('049 Patent, 7:34–36; *see id.*, 18:40–54.)  The "communication line" may be the same or may be different from the "subscriber line," but in essence, it is the line that communicates with the internet.  (*See* '049 Patent, Abstract.)

Second, PayPal argues the '049 Patent uses terms that are specific to landlines.  (*See* '049 Patent, 21:46–58.)  It also identifies examples in the specification of numbers being either "[u]nbillable" or "[d]enied" in the validation process because they were from cellular telephones.  (*See* excerpts from '049 Patent, Tables 2 & 3 (emphasis supplied).)

TABLE 2-continued

Validation & BNA Reply Codes

| Code | Action | Description | Explanation |
|------|--------|-------------|-------------|
| 187 | Unbillable | Credit Card Block | Auto decline of charges billed to Credit Card |
| 188 | Unbillable | Group Number Block | Auto decline of attempts from this group. |
| 189 | Unbillable | Audiotext Book | Number does not allow audiotext calls. |
| 190 | Unbillable | Excessive Calling Card PIN hits | Threshold for calling card attempts has been exceeded. |
| 191 | Unbillable | Line Number Block | Auto decline of all charges to this number |
| 200 | Unbillable | Excessive Use - BTN | BTN has exceeded threshold |
| 201 | Unbillable | Excessive Use DN | DN has exceeded threshold |
| 202 | Unbillable | Excessive Use - ANI | ANI has exceeded threshold |
| 203 | Unbillable | Excessive USE - Calling Card Pin | Calling Card Pin has exceeded threshold |
| 220 | Unbillable | Feature Group A | Local telephone switch is Feature Group A |
| 221 | Unbillable | PBX line | Line # is a PBX line |
| 222 | Unbillable | WATS line | Line # is a WATS line |
| 223 | Unbillable | Hotel/Motel Auto Quote w/ tax | Hotel/Motel Auto Quote w/ tax |
| 224 | Unbillable | Hotel/Motel Auto quote w/o tax | Hotel/Motel Auto quote w/o tax |
| 225 | Unbillable | Dormitory line | Line # belongs to a dorm |
| 226 | Unbillable | Hospital line | Line number belongs to a hospital |
| 227 | Unbillable | Centrex line | Line number belongs to CENTREX |
| 228 | Unbillable | Alternate Service Provider | Line # belongs to an alternate service provider |
| 229 | Unbillable | POTS line (collect or third party calls) | Line # is plain old telephone service lines for business or residential |
| 230 | Unbillable | Pager # | Line number belongs to a pager |
| 231 | Unbillable | PCS/Mobile/Cellular # | Line number belongs to a wireless provider |

| | | | TABLE 3-continued | | |
|---|---|---|---|---|---|
| | | | LIDB/LNP SOURCE TRANSLATIONS for ISP: | | |
| Resp. Type In | Resp. Code In | ACTION | LIDB ADMIN ? Description | rtfe type | EBI Code Out |
| DENY | 203 | Denied | Non billable NXX - DPC table failure. The NPANXX does not have routing or allow billing, e.g. cellular. (LIDB or Admin. Reply) | G2 | 180 |
| DENY | 297 | Denied | BNS: Cellular (cellular is distinct from mobile) | G8 | 231 |

PayPal concludes that these codes show there was no infrastructure for billing cellular telephones in 2001.[6] PayPal further contrasts "bill-to-landline" in 2001 with the state of cellular phones in the 2006–2007 timeframe, when the '500 and '504 Patents were filed, noting that *these* patents explicitly state in the specification that a "cellular telephone . . . may be used to initiate the communication." ('500 Patent, 2:1–4; '504 Patent, 4:13–16.)

Third, PayPal asserts that despite the specification's alternative embodiment of a cellular telephone, this reference is too vague to support PaymentOne's construction because (i) it is contrary to the teachings of the patent that necessarily require a landline, and (ii) it does not provide an explanation of *how* the cellular telephone embodiment would be implemented.   In sum, a catch-all cannot be used to teach away from the entire underlying premise of the patent.

### 2.    Court's Construction

The Court is persuaded that PayPal's construction accurately represents the teaching in the '049 Patent, which contemplated that the electronic terminal from which a consumer initiated a transaction was a computer connected to a telephone landline.  While a technical term in a patent claim should be construed in accordance with its description in the specification (*Phillips*, 415 F.3d at 1315), each party here focuses on the most helpful portions of the specification to support its respective position.  The only support for PaymentOne's construction is the referenced embodiment at 64:28–33, which provides that rather than a PC (item 24) "the machine *may* comprise . . . a cellular telephone."  (Emphasis supplied.)  In addition, there is the specification language at 66:24–28 confirming that the PC is an "exemplary form" of the computer system claimed.  Other than the

---

[6] PaymentOne responds that the examples of "[u]nbillable" or "[d]enied" codes associated with cellular telephones in the tables cannot be used to limit claims themselves, particularly where there is no indication from the tables that all cellular devices are categorically declined.  PaymentOne posits that the reason for rejection is not dispositive based on these tables; in other words, other reasons may have contributed to the reason that the transaction was declined.

United States District Court
Northern District of California

singular reference to a cellular telephone, the specification does not otherwise teach how wireless or cellular embodiments were contemplated. On the other hand, PayPal emphasizes certain instances in the tables where cellular telephones received unbillable or denied codes in the validation process. While PaymentOne argues that there is no support that cellular telephones were categorically denied or declined as unbillable, the Court does not find this argument to be persuasive in light of the description and explanation contained in the tables. Rather, the express teachings of the patent are directed to landline telephones and PaymentOne has failed to identify how a POSITA would understand the claims to apply to cellular embodiments.[7]

Based on the foregoing analysis, the Court provides the following constructions[8]:

"communication line" means "a communication channel over a wire or cable between a vendor and an electronic terminal over a physical communication network"; and

"subscriber line" means "a communication channel over a wire or cable that facilitates communication between a customer and a telephone company."

**B.      Third Claim Term/Phrase – "wherein payment is routed to financial card gateway if a validation module invalidates the transaction" / "selectively route processing of the transaction to a financial instrument gateway in the event of a validation process not validating the subscriber line" ('049 Patent, claims 8 & 22)**

The parties dispute whether the process described in these terms/phrases must occur automatically. The parties' proposed constructions are shown below with the key differences emphasized:

---

[7]  While claim 9 expressly references "a telephone number associated with the subscriber line," this does not compel the conclusion that claim 8 necessarily embodies cellular telephones.

[8] While the Court's constructions become the legally operative meaning of the disputed terms in future proceedings in this case, the Court reserves the right to modify its claim constructions prior to trial, if necessary and appropriate. *See Pressure Products Medical Supplies*, 599 F.3d at 1316 ("[a] district court[] may . . . revisit[] and alter[] its interpretation of the claim terms as its understanding of the technology evolves").

United States District Court
Northern District of California

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
|---|---|---|
| wherein payment is **routed** to financial card gateway if a validation module **invalidates** the transaction | wherein payment **is directed** to Financial Card Gateway if the validation module **nullifies** the transaction | wherein payment is routed to a financial card gateway **automatically** when a validation module **determines that the transaction cannot be charged to the telephone bill** |
| **selectively route** processing of the transaction to a financial instrument gateway in the event of a validation process **not validating** the subscriber line | selectively **directing** processing of the transaction to a Financial Instrument Gateway in the event of a validation process **nullifying** the Subscriber Line | **when a validation process determines that the transaction cannot be charged to the telephone bill of the subscriber, automatically** route processing of the transaction to a financial instrument gateway |

### 1.    Parties' Positions

PaymentOne argues that based on plain and ordinary meaning, PayPal's proposed use of "automatic" cannot be reconciled with the claim language of "selectively routing."  (*See* Plaintiff's Opening Claim Construction Brief ["PaymentOne's Opening Brief" (Dkt. No. 105)] at 9 (citing *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) and *Thorner v. Sony Computer Entm't America LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012) for the proposition that the "stringent" and "exacting" standard for deviating from ordinary scope of claims is not met).)  Thus, no support exists for PayPal's proposed limitation that the processes occur automatically.

Next, PaymentOne argues that the prosecution file history of the '049 Patent supports its construction for two reasons.  (*See* Declaration of Katherine K. Lutton in Support of PayPal's Responsive Claim Construction Brief ["Lutton Decl." (Dkt. No. 109-1)], Ex. G.)  First, the January 18, 2005 Notice of Allowance of the '049 Patent reflects that the PTO allowed the claims (then-pending claims 19 and 38, which became issued claims 8 and 22) as amended by the PTO examiner.  (*Id.* at ECF pp. 6–8.)  The amendments included the phrases that the parties now ask the Court to construe.  The PTO examiner's statement of reasons in the Notice of Allowance stated as follows:

As per independent claims 1, 15, 19, 29, 34, and 45 the closest prior art of record, Grandcolas et al. U.S. Patent 6,332,131 B1, Chen U.S. Patent 5,978,775 A, and Bouanaka et al. U.S. Patent 6,023,502 A taken either individually or in combination

United States District Court
Northern District of California

with other prior art of record fails to teach or suggest providing a user with an option, via an electronic terminal used to carry out the transaction, to select payment for the transaction from a telephone account associated with a subscriber line to which the electronic terminal is connected, receiving a user request entered into the electronic terminal to process payment from the telephone account, investigating data associated with the subscriber line including retrieving information form [*sic*] a line identification database (LIDB) and performing a validation process, selectively approving the transaction dependent upon an outcome of the investigation and selectively routing processing of the transaction to a financial instrument gateway in the event the validation of the subscriber line is not validated.

The specific allowable feature, which distinguishes the present invention over the prior art is that during the process of authorizing a payment utilizing the telephone account, if the subscriber line can not [*sic*] be validated/verified, the system would selectively route processing of the transaction to a financial instrument gateway.  The prior art stops the process and notifies the user of the failure to validate instead of automatically going to another form of payment.

(*Id.* at ECF pp. 9–10.)

PaymentOne emphasizes the fact that the PTO examiner explained that prior art "stop[ped] the process and notifie[d] the user of the failure to validate instead of automatically going to another form of payment."  (*Id.* at ECF p. 10.)  "[T]his is much different from saying that the systems of claims 8 and 22 *require* the automatic rerouting of a payment or transaction processing *without user intervention* if an initial transaction is not validated."  (PaymentOne's Opening Brief at 8 (emphasis supplied).)  PaymentOne asserts that the most reasonable interpretation of the allowed claims is that they were approved because they offered *some or any* form of alternative payment, unlike prior art which offered no such option and stopped the transaction entirely.  (*Id.* at 8–9.)

Second, PaymentOne emphasizes that despite using the word "automatic" in the statement of reasons, the PTO examiner elected not to include that language in the amended claims themselves.  If he intended to add such a limitation, he easily could have used such language in the claims. (Plaintiff's Reply Claim Construction Brief ["PaymentOne's Reply Brief" (Dkt. No. 121)] at 6.)  The use of the word in other claims of the patent is further support that the decision not to use the word in the claims was deliberate.

PayPal counters a prosecution disclaimer occurred and is reflected in the Notice of Allowance. PayPal contends that the routing referenced in the claims necessarily involves a causal relationship— *if* or *in the event* of an invalidation, *then* the software must take the action of routing processing to a

financial card gateway.  (PayPal, Inc.'s Responsive Claim Construction Brief ["PayPal's Responsive

Brief" (Dkt. No. 109)] at 13–14; Transcript at 65–66 (software and computer systems work by

automatic steps or decision trees).)  PayPal's primary intrinsic evidence is the "automatic" language

contained in the PTO examiner's statement of reasons, which PaymentOne accepted as part of the

claim in order to get the patent.  This explanation "informs the meaning of the disputed claim

language" and demonstrates that the patentee "understood the claims to require a causal relationship"

between the steps.  (*Id.* at 15.)  The "automatic" aspect is what distinguished the claims from prior art.

(*Id.*)

        PayPal next contends that "selectively" and "automatically" can be reconciled in the context of

the claims.  Specifically, claim 22 uses the word "selectively" twice to address two conditional steps[9]:

(i) that transactions will be either validated or invalidated based on an investigation, and (ii) only

those that are not validated will proceed to the routing process to a financial instrument gateway.

(PayPal's Responsive Brief at 15–16.)  In other words, a selective sub-set of transactions (those where

the primary payment by telephone number are invalidated) are automatically routed.  *See American

Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1339–40 (Fed. Cir. 2011) (agreeing with

district court's claim construction that "'[i]n response to' connotes that the second event occur in

reaction to the first event").[10]  No further action or information is needed once invalidated for this

routing to occur—*i.e.*, it is not optional, it is automatic.

---

[9] Claim 22 of the '049 Patent recites:
        A computer program product including a medium readable by a processor, the medium
        carrying instructions which, when executed by the processor, cause the processor to:
                provide a user, via an electronic terminal used to carry out a transaction, with an
                   option to select payment for the transaction from a telephone account associated
                   with a subscriber line to which the electronic terminal is connected;
                receive a user request entered into the electronic terminal to process payment from
                   the telephone account;
                investigate data associated with the subscriber line;
                selectively approve the transaction dependent upon an outcome of the investigation;
                   and
                selectively route processing of the transaction to a financial instrument gateway in the
                   event of a validation process not validating the subscriber line.

[10] In *American Calar*, the Federal Circuit explained: "The language of the claim itself suggests that
when a vehicle condition is detected, the processing element identifies a provider automatically as

14

**2.      Court's Construction**

The Court is not persuaded by PayPal's argument that "automatic" is necessary to clarify that there is a causal relationship between the event of the transaction being invalidated and routing. The claim language itself explains that routing only occurs "if" or "in the event of" invalidation. As such, the word "automatic" is not necessary for the purpose of "clarity," as PayPal argues.

Further, defining the term to include "automatic" is potentially confusing. The parties have stipulated that the term "automatically" (as used in the '500 Patent) means "without human intervention." (Am. Joint CC Statement at 2.) As a consequence and for consistency, a transaction under PayPal's construction would be "routed" without human intervention or the transaction would be processed without human intervention. Notably, the PTO examiner's failure to include "automatically" in the amended claim language is significant. The examiner's use of "automatically" in the statement of reasons is consistent with the above—automatic refers to the fact that routing occurs "if" or "in the event of" invalidation, compared to prior art which would have stopped the process and notified the user of the failure to validate. The fact that the '049 Patent proceeds beyond the invalidation step, whether automatic or otherwise, seems to have been the distinguishing point from the prior art. There is no evidence that the patentee intended to limit the invention to routing that occurred "without human intervention." *See Phillips*, 415 F.3d at 1317 (prosecution history "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be") (citing *Vitronics Corp*, 90 F.3d at 1582–83).

Based on the foregoing, the Court provides the following construction:

opposed to requiring further user interaction. Further, the specification fails to disclose any embodiment that requires any type of user interaction prior to identification of a service provider. Thus, the court properly construed the claim terms 'in response to' and 'when' to require a cause-and-effect relationship." 651 F.3d at 1340 (internal citation omitted).

1    "wherein payment is routed to financial card gateway if a validation module invalidates the

2    transaction" means "wherein payment is directed to a financial card gateway if a validation module

3    determines that the transaction cannot be charged to the telephone bill"; and

4    "selectively route processing of the transaction to a financial instrument gateway in the event

5    of a validation process not validating the subscriber line" means "selectively direct processing of the

6    transaction to a financial instrument gateway in the event that the transaction cannot be charged to the

7    telephone bill."

8    **C.    Fourth Disputed Claim Term/Phrase – "financial card gateway" / "financial**

9    **instrument gateway" ('049 Patent, claims 8 & 22)**

10        The substantive dispute over "financial card gateway" and "financial instrument gateway" is

11    whether the transaction must be directed to a user or purchaser's specific credit or debit card. The

12    parties' proposed constructions are shown below with the key differences emphasized:

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
|---|---|---|
| financial card gateway | access point **through which payments can be made** using a financial card | an entry point **to a** financial card provider **system that processes transactions involving a user or purchaser's credit or debit card** |
| financial instrument gateway | access point **through which payments can be made** using a financial instrument | an entry point **to a** financial instrument provider **system that processes transactions involving a user or purchaser's credit or debit card or other financial instrument** |

21        The parties do not significantly dispute each other's construction of an "access point" versus

22    "entry point."  Nor do the parties dispute that the transaction or payment is processed using the

23    financial card or financial instrument.

24        **1.    Parties' Positions**

25        Both parties focus on dictionary definitions to support their respective positions.

26    PaymentOne relies on the Microsoft® Encarta College Dictionary and The American Heritage

27    Dictionary from 2001 and 2000, respectively, to show that a "gateway" is a generic access point.

28

United States District Court
Northern District of California

(PaymentOne's Opening Brief, Exs. 5 & 6.)[11]  It argues its construction is proper when these definitions are read in conjunction with "financial card" and "financial gateway."

Putting aside the dictionary definitions, PaymentOne argues no support exists to impose a limitation to a specific financial card provider that processes transactions with a credit or debit card. In fact, the patent itself describes how financial instruments beyond credit or debit cards can be used for payment.  (*See* '049 Patent, 4:51–56 ("a user or purchaser using the electronic terminal **24** enters financial card details, e.g., credit card, debit card, or any other financial instrument details . . ."); *id.*, 5:50–55 & 6:42–47 (stating option of paying by "bank account").)

By contrast, PayPal contends that "financial card gateway" is a term of art, which requires that the gateway be related to a specific payment system.  PayPal relies on the MasterCard merchant glossary, which defines "MasterCard Payment Gateway (MPG)" as "[a] gateway hosted by MasterCard and used for routing and settling commercial e-payments between buyers and suppliers." (Lutton Decl., Ex. H. at 3.)  PayPal argues that this definition shows that the gateway must be specific.  It also argues that this definition trumps PaymentOne's dictionary definitions, because the MasterCard glossary reflects a definition from the relevant technological field, and PaymentOne merely strings together generic dictionary definitions.  (PayPal's Responsive Brief at 16–17.)[12]

PayPal also refers to two portions of the specification to support its construction.  First, the '049 Patent at 4:57–58 states: "The credit card gateway **42** may then either accept or reject the transaction."  Second, the '049 Patent at 6:37–42 provides "[t]he module **32** checks to determine whether or not a credit card number is present in the record and, if so, *the record is communicated to a credit card gateway for processing in a conventional fashion* and the procedure terminates as

---

[11] The Court notes that PaymentOne did not submit its exhibits by declaration as required by Civ. L.R. 7-5: "Factual contentions made in support of or in opposition to any motion must be supported by an affidavit or declaration and by appropriate references to the record.  Extracts from depositions, interrogatory answers, requests for admission and other evidentiary matters must be appropriately authenticated by an affidavit or declaration."

[12] PaymentOne counters that the MasterCard definition provided by PayPal does not contradict its own construction.  "A person of ordinary skill would recognize that a <u>MasterCard</u> Payment Gateway is of course <u>hosted by MasterCard</u>, but would not expect that a generic gateway must also be hosted by MasterCard."  (PaymentOne's Opening Brief at 11 (emphasis in original).)

shown as step **102**."  (Emphasis supplied.)  PayPal concludes that these references support the MasterCard definition.

> **2.**      **Court's Construction**

>        The Court finds that the language of the patent does not require reference to a specific process.  The term at issue is not particularly technical thereby requiring the narrow construction offered by PayPal.

>        PayPal's arguments are unavailing.  The Court is not persuaded that a glossary, created by a specific card company to refer to internal systems or processes, requires the Court to impose a similarly narrow construction for the purposes of claim construction.  Further, while Exhibit H appears to have been accessed in September 2012, there is no indication when this glossary or the relevant definition was prepared, nor whether this glossary was publicly available in 2001.

>        The specification itself provides that options other than credit or debit cards exist for payment of transactions.  ('049 Patent, 4:53–56, 5:50–55 & 6:42–47.)  Although these excerpts speak to the providing an additional option of paying by "phone bill," the possibility of other "financial instruments" and "bank accounts" indicate that payment need not necessarily be as limited as PayPal suggests.  In sum, PayPal has not presented sufficient evidence to limit the claims to a specific credit or debit card payment system where no such limitation exists in the claim or specification.

>        For the foregoing reasons, the Court provides the following constructions:

>        "financial card gateway" means an "access point through which payments can be made using a financial card"; and

>        "financial instrument gateway" means "access point through which payments can be made using a financial instrument."

> **D.**      **Fifth Claim Term/Phrase – "automatically detecting an event indicative of an option to charge the second transaction to the user using an alternative payment method" / "to detect, automatically, an event indicative of an option to charge the second transaction to the user using an alternative payment method" ('500 Patent, claims 1 & 17)**

>        The parties initially disagree as to whether these phrases require construction.   Next, the parties dispute whether the phrase "indicative of an option" means the system must "prompt

18

presentation" of the option to charge the second transaction. The parties' proposed constructions are shown below with the key differences emphasized:

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
|---|---|---|
| | No construction needed | |
| automatically detecting an event **indicative of** an option to charge the second transaction to the user using an alternative payment method | Automatically detecting an event **relating to** the option to charge the second transaction to the user using an alternative payment method | automatically detecting an event **that prompts presentation of an option to the user** to charge the second transaction using an alternative payment method |
| to detect, automatically, an event **indicative of** an option to charge the second transaction to the user using an alternative payment method | To detect, automatically, an event **relating to** the option to charge the second transaction to the user using an alternative payment method | to detect, automatically, an event **that prompts presentation of an option to the user** to charge the second transaction using an alternative payment method |

### 1.   Parties' Positions

PaymentOne contends that no construction is required because the plain meaning speaks for itself—when a payment by telephone number is declined, the system detects an event indicative of an option to charge the transaction to the user using an alternative payment method, such as a credit card.

PaymentOne agrees with PayPal that the specification does not explain the meaning of these phrases, but notes there is language in the specification relevant to this construction. Namely, the codes generated by the system in response to the optional use of a credit card are "an exemplary description and explanation." ('500 Patent, 11:28–30.) PaymentOne argues that PayPal's proposal to require an event that "prompts presentation" is unsupported because (i) the specification only referred to "optional use" and (ii) that reference was intended as an example in the first place, not a mandate. As to its own construction, PaymentOne argues that equating "an event indicative of an option to charge" to "an event relating to the option to charge" stays true to the meaning of the claim term without importing any additional limitations.

United States District Court
Northern District of California

PayPal, on the other hand, argues there is no commonplace or self-evident meaning for "an event indicative of an option to charge" and, as such, construction is necessary for a jury.[13]

PayPal bases its construction on language in the specification of the '500 Patent, 11:33–12:30:

> In the event of the subscriber line **17** failing the checks carried out on it, the system **10** provides optional use of a credit card and, accordingly, Table 2 sets out codes which the system **10** generates in response to executing a standard credit card enquiry for a particular transaction.

PayPal argues that, based on this language, the user has to be presented or provided with the option in order for the user to choose the option. Thus, it is appropriate to construe the phrases such that the system "prompts presentation of an option." PayPal acknowledges there is no other language in the specification that teaches what the claims mean with regard to these phrases.

### 2. Court's Construction

The Court is not satisfied with either party's construction. As to the proposed constructions, the critical difference is how to construe what it means to "detect an event *indicative of an option* . . . ." (Emphasis supplied.) In the limited context of the phrases proposed for construction, "indicative of" is not readily understandable. The parties' constructions, however, would do little to aid a jury in understanding what it means for an event to be "indicative of" an option. Specifically, the Court finds PaymentOne's substitution of "relating to" for "indicative of" does not clarify the intended meaning in any manner and that "relating to" is equally ambiguous. At the same time, the Court is not persuaded that the specification supports a limitation that the system must "prompt presentation of an option," as PayPal proposes. The insertion of "prompt presentation" is likely to confuse the jury to the extent that (i) the phrase itself lacks clarity, and (ii) a "prompt" has its own meaning with respect to computers.

The Court believes that when read in the full context of the claims, a jury is more likely to understand what it means for an event to be "indicative of" an option than when reading the proposed phrase in a vacuum. Based on the entire claim language, it is clear that there are two transactions, the first of which is received and charged to a subscriber account associated with the billing telephone

---

[13] PayPal asserts PaymentOne's construction is vague, provides no clarity regarding the event "relating to" the option, and is not based on any evidence or reasoning.

1  number.  The system detects a second transaction, but also detects that billing to the prior form of

2  payment—the account associated with the billing telephone number—has been declined.  The system

3  detects that this is an event where the user can be provided with an option to charge the second

4  transaction to an alternative payment method, and the second transaction is charged to the alternative

5  payment method—not the subscriber account.  The parties' proposed constructions, however, do little

6  to clarify any step set forth in claims 1 and 17.

7        At this time, the Court has yet to conceive of alternative language that would remove any

8  potential ambiguity that exists from the phrase "indicative of" while remaining true to the intended

9  meaning of those claims.  For these reasons, the Court declines to construe this term without prejudice

10  to construe "indicative of" at an appropriate time prior to trial.

11  **E.    Sixth Claim Term/Phrase – "billing telephone number (BTN)" / "BTN" ('500**
12  **Patent, claims 1, 10, 17 & 26 and '504 Patent, claims 1, 43, 101, 102 & 107)**

13        PayPal proposed an amended construction following the completion of claim construction

14  briefing.  (Transcript at 80–82.)  The parties submitted supplemental briefs on this term.  Each party

15  presents a construction that it believes stays true to the claims in the patents.  The parties' proposed

16  constructions are shown below with the key differences emphasized:

17

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "billing telephone number (BTN)" and "BTN" | telephone number **associated with a billing account** | **telephone number billed** for a transaction |

20  **1.    Parties' Positions**

21        PaymentOne argues that PayPal's amended construction attempts to narrow the

22  meaning of the term in contravention of the doctrine of claim differentiation.  (Plaintiff PaymentOne

23  Corporation's Response to PayPal, Inc.'s Revised Proposed Construction of the Terms "Billing

24  Telephone Number (BTN) / BTN" ["PaymentOne's Supplemental BTN Briefing" (Dkt. No. 125)] at

25  2.)  Specifically, PaymentOne asserts that PayPal imposes an overly-narrow requirement that "a

26  transaction recited in the claims in which the terms appear be billed to a 'telephone number' (i.e., a

27  *telephone account*)."  (*Id.* at 2 (emphasis supplied).)  Claim 1 of the '500 Patent refers to "charging of

28  the first transaction to the subscriber account associated with the BTN."  Dependent claim 4 recites

"[t]he method of claim **1**, wherein the subscriber account is a telephone account." PaymentOne thus

argues that the subscriber account of claim 1 is not limited to a telephone account. In addition,

PaymentOne's own construction that the telephone number is "associated with" a billing account is

supported because a comparison of claims 1 and 4 shows that the telephone number "can be

associated with types of accounts other than just telephone accounts (put otherwise, including but not

limited to telephone accounts)." (PaymentOne's Supplemental BTN Briefing at 3.)

PayPal argues that plain meaning supports its construction: a billing telephone number is a

telephone number that is billed. It asserts PaymentOne's proposed construction attempts to construe

the term too broadly as "any type of billing account having any telephone number associated with it."

(PayPal, Inc.'s Reply to PaymentOne Corporation's Response to PayPal's Revised Proposed

Construction of the Terms "Billing Telephone Number (BTN) / BTN" ["PayPal's Supplemental BTN

Briefing" (Dkt. No. 130)] at 1); *see Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d

1296, 1305 (Fed. Cir. 2011) (court must "strive to capture the scope of the actual invention, rather

than strictly limit the scope of claims to disclosed embodiments or allow the claim language to

become divorced from what the specification conveys is the invention").[14] This is contrary to the

specifications of the '500 and '504 Patents, which require that the subscriber account associated with

the BTN be a telephone account. (PayPal's Supplemental BTN Briefing at 2; *see* '500 Patent, 3:40–

44 & 3:53–64.) For example, PaymentOne's broad attempt to equate a BTN to a telephone number

that is "in some way tied to another billing account (e.g. credit card)" contravenes the specification

teaching that the system for "validating the billing account associated with the subscriber line" is

distinct from processes "using a conventional payment techniques [*sic*] such as a credit card, debit

card, bank account details or the like." (PayPal's Supplemental BTN Briefing at 3; '500 Patent,

---

[14] In *Retractable Tech.*, an independent claim recited a "body" a dependent claim recited a "one piece body." 653 F.3d at 1305. The Federal Circuit held that the "district court erred when it construed 'body' as encompassing bodies composed of multiple pieces" because the specification expressly recited the invention "ha[d] a body constructed as a single structure, expressly distinguish[ed] the invention from the prior art based on this feature, and only disclose[d] embodiments that [we]re expressly limited to having a body that is a single piece." *Id.* ("construction of "body" that limits the term to a one-piece body is required to tether the claims to what the specifications indicate the inventor actually invented").

39:41–46.)  Lastly, PayPal argues that PaymentOne patents not at issue in this action support that the billing telephone number must be associated with a telephone account.

### 2.     Court's Construction

The Court agrees with PayPal.   PaymentOne has provided no persuasive reason that a billing telephone number is not, effectively, the telephone number billed for a transaction. PaymentOne's attempts to define the term being a telephone number *associated with a billing account* are likewise unsupported based on plain meaning.  Moreover, if the Court were to construe the term as proposed by PaymentOne, it would create redundancies within the relevant claims and potentially confuse the jury.  (*See*, *e.g.*, '500 Patent 42:18–19 (portion of claim 1 would read: "charging the first transaction to a subscriber account associated with the telephone number associated with a billing account").)

Based on the foregoing, the Court will adopt PayPal's proposed construction of the disputed phrase, which the Court believes comports with its plain meaning.  However, the Court notes that PayPal's construction does not take into account that at certain steps of the process, such as when a BTN *is being* obtained, the telephone number will not yet have been "billed."  For this reason, the Court believes it is appropriate to include both the future and past tense of "billed" in its construction.

As such, the Court construes a "billing telephone number (BTN)" and "BTN" to mean "telephone number billed or to be billed for the transaction."

### F.     Seventh Claim Term/Phrase – "determine [first/second] reference subscriber data" ('504 Patent, claims 1, 43, 101 & 102)

The parties have three disputes over the construction of this term/phrase.  The primary dispute relates to whether the data to be obtained must be "stored" in the database searched.  The parties' proposed constructions are shown below with only the key difference emphasized:

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
|---|---|---|
| determine [first/second] reference subscriber data | obtain [first/second] data associated with a customer | obtain [first/second] **stored** data about a subscriber |

United States District Court
Northern District of California

The remaining disputes are secondary: first, the parties agree that the difference between "associated with" and "about" is not significant and each proffers its construction as being more understandable to a jury.[15]  Second, they dispute whether "customer" or "subscriber" is more appropriate.  The parties agree that "determine" means "obtain."

The claims implicated by this term/phrase recite steps of:

| Claim 1 | Claims 43, 101, and 102 |
| --- | --- |
| "searching a first database using the ANI data or the BTN data to determine first reference subscriber data" and "searching a second database using the identification data to determine second reference subscriber data" | "[requesting/request] a search of a first database using the ANI data or the BTN data to determine first reference subscriber data" and "[requesting/request] a search of a second database using the identification data and the first reference subscriber data to determine second reference subscriber data" |

### 1.     Parties' Positions

**Stored Data**: As to the primary dispute, PaymentOne argues that the explicit terms of the '504 Patent do not require the data to be stored.  Had a storage requirement been intended, the patentee would have used terms like "retrieve," "return," or "inquiry" in the claims, which are "words that you might associate with data that is stored in a database."  (Transcript at 83–84.)  To the extent that the '504 Patent specification refers to "return[ing]" LIDB (line identification database) codes after interrogating a database, PaymentOne emphasizes that such embodiment was exemplary and cannot be imported to limit claims in their entirety.  (*See* '504 Patent, 7:26–27 & 7:34–37 and claim 17.)

PayPal responds that data must reside in a database.  (PayPal's Responsive Brief at 21 ("If the data was not stored in the database, then the data could not be obtained by searching the database as required by the undisputed plain language of the claims.").)  PayPal further contends that the plain and logical understanding of "data" supports the storage requirement.  *See Comcast Cable Commc'ns Corp., LLC v. Finisar Corp.*, No. C 06-04206 WHA, 2007 WL 1052821, at *4 (N.D. Cal.

---

[15] PaymentOne argues that "associated with" provides more clarity and consistency for the jury because that phrase is used elsewhere in claim 1 and throughout the '504 Patent.  PayPal responds that requiring that data be specifically "about" a customer is in line with other language of the claims— "[first/second] *reference* subscriber data" (emphasis supplied).

Apr. 6, 2007) ("Both parties agree that th[e] term ['information database'] indicates some grouping of data.  Lay jury members would understand the term 'information,' and also that a 'database' is stored in some fashion.").  Moreover, the specification refers to a database and thus supports this plain meaning construction.  ('504 Patent, 7:34–37 ("[o]nce the LIDB *database* or host **52** has been *interrogated*, it *returns* industry standard LIDB codes . . .") (emphasis supplied).)

**"Customer" versus "Subscriber"**: PaymentOne argues that there is no difference and the patent uses these terms interchangeably.  (*See, e.g.*, '504 Patent, 1:15–17, 41:8–20 & 41:26–30.)  It prefers the term "customer" because it is easier for a jury to understand than "subscriber."

PayPal argues that the customer and subscriber are frequently the same person, but there are circumstances where the customer is not the subscriber.  This is specifically contemplated by the '504 Patent at 8:45–59, and therefore must be distinguished in the relevant claims as well.  (Transcript at 86.)

### 2.    Court's Construction

The Court agrees that by necessity the data must be stored under the teachings of the patent.  PaymentOne's argument that the absence of terms that are indicative of "data stored in databases" misses the point.  The claims clearly state that the *first and second* databases are "searched" with certain data in hand in order to obtain another piece of data.  The Court cannot conceive, in the context of these claims, how the data could not be stored in the database that it is explicitly searching.  The fact that the sought-after data *could be* obtained from sources other than the first and second databases[16] was not recited by the implicated claims, although it is theoretically possible that the data also exists elsewhere.

As to use of the word "customer" or "subscriber," the Court notes that the information to be "determined" (obtained) is the "[first/second] reference subscriber data."  Construing the phrase to refer to a "subscriber" will maintain consistency throughout the claims at hand, which otherwise do not reference a "customer."  Moreover, the parties concede that this distinction is unlikely to bear

---

[16] *See, e.g.*, Transcript at 90 ("[T]here's no indication necessarily that the first reference subscriber data has to come from the database.  There could be searching happening potentially.  There could be something else happening.").

great significance, since customer/subscriber is either used interchangeably in the patent or typically refers to the same person.

Based on the foregoing analysis, the Court adopts PayPal's construction and provides the following construction:

"determine [first/second] reference subscriber data" means "obtain [first/second] stored data about a subscriber."

### G. Eighth Claim Term/Phrase – "the first reference subscriber data corresponds to the second reference subscriber data" / "the second subscriber data corresponding to the first reference subscriber data" ('504 Patent, claims 1 & 43)

The parties agree that the two pieces of data must "match" each other, but dispute only whether the data must be "separate." The parties' proposed constructions are shown below with only the key difference emphasized:

| TERM/PHRASE | PAYMENTONE'S PROPOSED CONSTRUCTION | PAYPAL'S PROPOSED CONSTRUCTION |
| --- | --- | --- |
| the first reference subscriber data corresponds to the second reference subscriber data | the First Reference Subscriber Data matches the Second Reference Subscriber Data | the first reference subscriber data matches the second, **separate** reference subscriber data |
| the second subscriber data corresponding to the first reference subscriber data | the Second Reference Subscriber Data matching the First Reference Subscriber Data | the second reference subscriber data matching the first, **separate** reference subscriber data |

Claims 1 and 43, which were both implicated in the construction of the last term/phrase, recite the following (the relevant phrase is highlighted):

| Claim 1 | Claim 43 |
|---|---|
| An identity verification method, the method comprising:<br><br>    obtaining automatic number identification (ANI) data or billing telephone number (BTN) data associated with a subscriber line of a telecommunications network;<br><br>    obtaining identification data associated with a subscriber, said identification data being different from the ANI data or the BTN data;<br><br>    searching a first database using the ANI data or the BTN data to determine first reference subscriber data;<br><br>    searching a second database using the identification data to determine second reference subscriber data;<br><br>    comparing the first reference subscriber data to the second reference subscriber data; and<br><br>    verifying an identity of the subscriber if **the first reference subscriber data corresponds to the second reference subscriber data**. | An identity verification method, the method comprising:<br><br>    obtaining automatic number identification (ANI) data or billing telephone number (BTN) data associated with a subscriber line of a telecommunications network;<br><br>    obtaining identification data associated with a subscriber, where said identification data is different from the ANI data or the BTN data;<br><br>    requesting a search of a first database using the ANI data or the BTN data to determine first reference subscriber data;<br><br>    requesting a search of a second database using the identification data and the first reference subscriber data to determine second reference subscriber data;<br><br>    comparing the first reference subscriber data to the second reference subscriber data; and<br><br>    verifying an identity of a subscriber based on **the second subscriber data corresponding to the first reference subscriber data**. |

### 1.     Parties' Positions

PaymentOne asserts that no support exists for a limitation requiring that the first and second reference subscriber data be separate from each other.  The claims recite steps of searching a first database, then a second database, and after obtaining each piece of data, they are compared.  The claims do not, however, speak to the issue of the reference subscriber data being different.  PaymentOne concedes that the data "might be different, but . . . they do not have to be, nor do they have to be separate."  (PaymentOne's Reply Brief at 11.)

PaymentOne also draws on language in other claims and the specification to support its proposed construction which provides that identity may be verified by checking whether data of the same format corresponds.  Specifically, claim 17 recites that the two pieces of data may be in the form

of "only one LIDB code." (PaymentOne's Opening Brief at 19; *see* '504 Patent, claim 17 ("The identity verification method of claim **1**, wherein the first reference subscriber data and the second reference subscriber data are in a form of one or more LIDB codes."); '504 Patent, 8:16–19 ("processor module **54** checks to see if the OCN returned from the LIDB host **52** corresponds with a known CLEC or if the OCN corresponds with an OFFNET OCN")[17] & 8:48–59 ("The system **10** then interrogates an address verification database **44** to compare the address or location data (e.g. a ZIP code) supplied by the customer **11** with a reference address data as shown at operation **112**. If, however, the address supplied by the customer **11** does not match with the address in the verification database **44** . . .").) Based on this intrinsic language, PaymentOne concludes that the data to be matched need not necessarily be separate.

PayPal's construction is based on the fact that the claims recite four pieces of information: (i) telephone number data; (ii) identification data associated with the user; (iii) first reference subscriber data; and (iv) second reference subscriber data—with the third and fourth pieces of information being obtained by searching a first and second database. PayPal argues that there are two separate steps to follow the method of the claims, wherein the first two pieces of information are used to identify the third and fourth pieces of information. PayPal acknowledges that the data to be compared may have the same "substance" or "value." (PayPal's Responsive Brief at 25; Transcript at 96 ("You might certainly compare two pieces of information with the same value, but not a piece of information with itself.").) However, it seeks to clarify for the jury that these are separate pieces of information. *See 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("The use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation."). (*See* Transcript at 96.)[18]

---

[17] As defined in the patent specification, the CLEC, OCN, and OFFNET OCN each refer to specific databases.

[18] Both parties contend that the other's construction renders the "comparison" of first and second reference subscriber data useless. There would be no reason to compare data if they always have to be separate or different, just as there would be no purpose in comparing the same pieces of information.

2.      **Court's Construction**

The Court finds the inclusion of the word "separate" to be unsupported and unnecessary for PayPal's stated purpose.  The relevant claims recite that two pieces of data are obtained through separate steps or processes—namely, that the first and second databases are searched such that the system can obtain the first and second reference subscriber data that will be compared. However, adding the word "separate" (as PayPal suggests) conveys that the data itself is separate, not the step obtaining the data, and does not recognize, as PayPal acknowledges, that the data itself may have the same value.  As proposed, the Court finds that addition of "separate" imposes an unintended meaning and is likely to confuse the jury.  The Court does not believe that the claims need further clarification than what the parties have agreed to—that "correspond" means "match."

Based on the foregoing reasons, the Court adopts PaymentOne's construction except for the capitalization of terms contained therein.[19]

The Court hereby provides the following constructions:

"the first reference subscriber data corresponds to the second reference subscriber data" means "the first reference subscriber data matches the second reference subscriber data"; and

"the second subscriber data corresponding to the first reference subscriber data" means "the second reference subscriber data matching the first reference subscriber data."

**IV.     PAYPAL'S PATENT: CLAIM CONSTRUCTION ANALYSIS**

**A.      Ninth Claim Term/Phrase – "secure part of said computer system" ('917 Patent, claim 1)**

The parties dispute the scope of the "secure part" of the computer system in the '917 Patent. The parties' proposed constructions are shown below with the key differences emphasized:

---

[19] PaymentOne fails to explain the reason for the capitalization of terms within its proposed construction.

United States District Court
Northern District of California

| TERM/PHRASE | PAYPAL'S PROPOSED CONSTRUCTION | PAYMENTONE'S PROPOSED CONSTRUCTION |
|---|---|---|
| | Ordinary meaning | |
| secure part of said computer system | a portion of the computer system with **restricted accessibility** via the quasi-public network | Original construction: a **private network**, such as an Ethernet network<br><br>First alternative construction: **computer hardware and software running on a private network**, such as an Ethernet network<br><br>Second alternate construction: **computer hardware and software running on a private network which is part of said computer system**, such as an Ethernet network |

Claim 1 recites the following:

A method for enabling a seller and a buyer communicating over a quasi-public network to initiate a commercial transaction involving a payment of funds by the buyer to the seller, said method comprising the steps of:

> on a computer system coupled to said quasi-public network, receiving a message over the quasi-public network from the seller, the seller's message identifying the buyer and a transaction;

> from said computer system coupled to said network, sending a message over the quasi-public network to the identified buyer, said message to the buyer identifying the transaction;

> on said computer system coupled to said quasi-public network, receiving a message over the quasi-public network from the identified buyer, said buyer's message indicating acceptance or refusal of the transaction;

> if the buyer's message indicates approval of the transaction, from a secure part of said computer system, communicating to an agent of the seller via a secure communication channel information for permitting the buyer to pay for transaction;

> on said secure part of said computer system, receiving an authorization code from the seller's agent via said secure communication channels; and

> from said computer system coupled to said quasi-public network, sending a cryptographically-signed message including the authorization code to the seller via the quasi-public network.

United States District Court
Northern District of California

### 1.     Parties' Positions

PayPal argues that its construction—proposed only to the extent that the Court deems construction necessary—is derived from the language in claim 1 above, which recites two parts of a computer system: the user-accessible (non-secure) portion and the secure part of said computer system.  While the patent does not expressly define what is secure, PayPal contends that the specification and drawings confirm what was meant by secure and the "secure part of said computer system."

PayPal explains that the '917 Patent sought to address "security problems" arising from "sending a credit card number over the Internet."  ('917 Patent, 1:29–36.)  As shown in Figure 1 (reproduced below), the payment system contains two parts: an above-the-line system and a below-the-line system.



(Emphasis supplied.)

Figure 1 indicates that the above and below-the-line systems are separated by a line **44** called a firewall.  ('917 Patent, 3:51–67.)  The firewall "isolates the above-the-line system **40** from the below-the-line system **42**" and "permits limited communication" between the two systems, "but prevents unauthorized access to the below-the-line system **42** through the above-the-line system **40**."  (*Id.*)  The firewall "provides security for the information contained on the below-the-line system **42** and prevents hackers on the Internet from entering the below-the-line system **42** via the above-the-line system."  (*Id.*)  Put another way, "[t]he above-the-line system **40** relates to the computer hardware and

1   software on the non-secure side of the firewall **44** and the below-the-line system **42** relates to the

2   computer hardware and software *on the secure side of the firewall* **44**." (*Id.* (emphasis supplied).)

3           The specification further teaches that the above-the-line computer system runs an above-the-

4   line a software program that "provides for communication with users **14** of the Internet **12**." (*See*

5   '917 Patent, 4:46–52 and Fig. 3, reproduced below.)  The below-the-line system runs its own

6   program, which is "physically separate and isolated" from the above-the-line program.  (*Id.*, 4:53–57.)

7   The communications between the above and below-the-line programs occur "via the private network

8   **53**." (*Id.*)



FIG. 3

17          "The below-the-line program **92** receives information from and sends information to the

18  above-the-line program **90** by means of batch processing.  This comprises, in part, the firewall or line

19  **44** and results in an inherently safe method of communicating between the publicly accessible part of

20  the payment system, i.e. the above-the-line system **40**, and *the secure part of the payment system, i.e.*

21  *the below-the-line system* **42**." (*Id.*, 4:57–65 (emphasis supplied).)

22          Based on this intrinsic evidence, PayPal argues that "secure part" of the system cannot be the

23  part of the system accessible to internet users.  It must be the portion that the patent figures and

24  specification refer to as the below-the-line system.  (*See* PayPal, Inc.'s Opening Claim Construction

25  Brief [Dkt. No. 104] at 18–20; PayPal, Inc.'s Reply to PaymentOne Corporation's Responsive Claim

26  Construction Brief [Dkt. No. 122] at 8.)

27          In contrast, PaymentOne argues that the specification, figures, and doctrine of prosecution

28  disclaimer support its constructions.  PaymentOne's initial construction defined the "secure part of

said computer system" as "a private network, such as an Ethernet network."[20]  PaymentOne's briefing

argued that PayPal sought a construction "under which both the quasi-public network and the secure

part of the computer system *are the internet*."  (PaymentOne's Responsive Brief at 3 (emphasis

supplied).)  According to PaymentOne, "[t]he point . . . is that the secure part of the computer system

is a private network connection – <u>not</u> the internet."  (*Id.* (emphasis in original).)

     To support its initial construction, PaymentOne emphasized that the patent describes figures in

the patent such that "[t]he above-the-line computer **50** and below-the-line computer **52** are connected

together via a private network.  In a preferred embodiment, the private network is an Ethernet

network." ('917 Patent, 4:5–8.)  Further, the specification teaches that "[t]he below-the-line

computer **52** is connected to the above-the-line computer **50** by means of Ethernet cable.  The below-

the-line computer **52** also has a Novell LAN **81** that provides a secure communication link apart from

the Internet." (*Id.*, 4:21–24.)

     At the claim construction hearing, PaymentOne seemed to shift its argument to different

portions of the specification to show that certain steps of claim 1 must occur on a private network, as

opposed to the internet.  Specifically, the specification states that "[t]he communication **250** to the

seller's agent **115** is performed off the Internet on secure communication channels." ('917 Patent,

10:56–58; Transcript at 105.)  As such, PaymentOne argued that the secure part of the system was

"really limited to a transaction which the bank card processor, which is the seller's agent, such as

Visa[,] is communicating on a private network.  And that is what [its] proposed construction reflects."

(Transcript at 105; *id.* at 106 (in "Figure 1 where the communication between the seller's agent and

---

[20] PayPal argues that PaymentOne's initial construction of "a private network, such as an Ethernet network" eliminates the requirement that the "secured part" be *of* a "computer system." (PayPal's Reply Brief at 7.)  It also argues that PaymentOne's initial construction reads out the embodiments that the computer system must run programs and store data files. (Transcript at 102–103.)  In response, PaymentOne proposes its first alternative construction—"computer hardware and software running on a private network, such as an Ethernet network"—to clarify that a computer system is running on the private network. (PaymentOne Corporation's Response to PayPal, Inc.'s Opening Claim Construction Brief ["PaymentOne's Responsive Brief' (Dkt. No. 108)] at 5; Transcript at 107.) To the extent that the Court may still have concerns over whether a jury would understand that the hardware or software is part of the computer system, PaymentOne proposes its second alternative— "computer hardware and software running on a private network which is part of said computer system, such as an Ethernet network." (Transcript at 108.)

1   the payment system is happening off of the internet[,] [t]hat's the secure part in contradistinction to

2   the quasi-public network, which is the internet.").)

3          PaymentOne also argues that the doctrine of prosecution disclaimer supports its construction.

4   PaymentOne asserts that "the patentee initially attempted to claim a system without the requirement

5   that 'communicating to an agent of the seller' and 'receiving an authorization code' occur on a private

6   network." (PaymentOne's Responsive Brief at 6.)  PaymentOne attached to its Responsive Brief a

7   document purporting to show that "[o]n February 5, 1997, the Patent Office rejected [the patentee's

8   initial claims] as being unpatentable in light of prior art, and, in response, the patentee amended the

9   claims to include a clear delineation between steps that occur on the quasi-public network and those

10   that occur on a secure part of the computer system."  (*Id.* & Ex. A at 2.)[21]   PaymentOne then

11   concludes that by including the "secure part of the computer system," the patentee disavowed any

12   system where the communication to the seller's agent or receipt of the authorization code occur over

13   the internet.  (PaymentOne's Responsive Brief at 6.)

14          PayPal responds that PaymentOne's reliance on the specification at 10:56–60 only proves that

15   PayPal's construction is appropriate.  Claim 1 recites certain steps that occur from the "secure part of

16   said computer system," but it separately recites as a claim term that certain communications with the

17   seller's agent occur "via a secure communication channel" or "via said secure communication

18   channels."  The pertinent language reads:

19         if the buyer's message indicates approval of the transaction, from a secure part of said
20         computer system, communicating to an agent of the seller *via a secure communication
          channel information* for permitting the buyer to pay for transaction;

21
22         on said secure part of said computer system, receiving an authorization code from the
          seller's agent *via said secure communication channels* . . .

23   ('917 Patent, 12:60–67 (emphasis supplied).)  PayPal argues that the secure part of the computer

24   system and the secure communication channels are different.  (Transcript at 109 ("This secure

25   communication channel . . . is not the secure part of the computer system.").)

26

27   _____

28   [21] The Court notes that, again, PaymentOne failed to comply with the Local Rule requiring that
    documents be authenticated and submitted by declaration.  Civ. L.R. 7-5.

United States District Court
Northern District of California

### 2.      Court's Construction

The Court agrees with PayPal that no construction is necessary.  At this time, neither party proposes a satisfactory construction and the Court nonetheless finds that a jury will understand what is meant by the "secure part of said computer system" in the context of the entire claim.

As to the meaning of the "secure part of said computer system," the Court generally agrees with PayPal's arguments in support of ordinary meaning and its construction.  However, PayPal's proposed construction—as drafted—also risks confusing the jury, and for that reason, the Court declines to adopt it.  Based on the teachings in the specification, a jury can understand what is the "secure part of said computer system" without construction.  The specification and corresponding figures teach that the below-the-line system, as shown in the figures, was considered the "secure side of the firewall" and the "secure part of the payment system." ('917 Patent, 3:51–67 & 4:53–65.)  The specification further teaches that the above-the-line system is the publicly accessible part of the payment system. (*Id.*, 4:46–52.)  The existence of dual above and below-the-line systems is consistent with the language in claim 1 that the "computer system [is] coupled to said quasi-public network"—*i.e.*, the internet.  The steps wherein particular messages occur from a secure part of said computer system does not negate that there is still an above-the-line part of the system that is coupled to the internet.  Even if the preferred embodiment for the connection between the above and below-the-line systems is an Ethernet (private) network ('917 Patent, 4:5–8 & 4:21–25), as argued by PaymentOne, this does not limit necessarily the rest of the below-the-line system from being secure.

Further, the Court agrees with PayPal that the "secure communication channel[s]" and "secure part of said computer system" are not the same.  Rather, they are separate claim terms in claim 1, wherein claim 1 explicitly references the "secure part of said computer system" as distinct from the "secure communication channel[s]" through which information is exchanged with the seller's agent. ('917 Patent, 12:60–68; *see id.*, 10:50–62 ("below-the-line system **42** communicates with the seller's agent" which is "performed off the Internet on secure communication channels").)  Consistent with the specification teaching that the below-the-line system—*i.e.*, the secure part of the computer system—has secure communications with the seller's agent, the secure channel communication cannot be the entire secure part of said computer system, as PaymentOne argues. (*See* Transcript at

105–106 (arguing that communication between seller's agent and payment system is the "secure part" of the computer system).)

As to PaymentOne's proposed constructions, the Court finds that each construction fails to provide any clarity as to what was meant by the "secure part of said computer system" and unnecessarily focuses on the location of various steps of claim 1.  Each construction refers to an "Ethernet network," which is itself neither defined nor explained and may be confused with the term "internet."  Further, two of PaymentOne's proposed constructions insert the phrase "computer hardware and software running on a private network," which is inherently confusing and cumbersome.  These constructions will not aid a jury in understanding that there are two portions of the computer system: an above-the-line part coupled to the internet and a below-the-line part that is secure.

As to PaymentOne's prosecution disclaimer argument, the Court is not persuaded that Exhibit A supports the specific constructions proposed by PaymentOne.  PaymentOne argues that "the patentee disavowed any system in which the steps of 'communicating to an agent of the seller' and 'receiving an authorization code' occur *over the internet*."  (PaymentOne's Responsive Brief at 6 (emphasis supplied).)  The Court agrees that language in the specification supports the argument that communications *with the seller's agent* must occur off the internet on secure communication channels.  (*See* '917 Patent, 10:56–61 & 11:26–32; *see* Exhibit A to PaymentOne's Responsive Brief at 9 and Remarks ¶ A.)  However, Exhibit A does not support imposing an additional limitation of a "private network" for the "secure part of said computer system."  There is no indication that the PTO examiner found the specific location of a "private network" to be dispositive in allowing the claim 1.  The Court notes that PaymentOne's arguments appear to be directed to defining "secure communication channel information" or "secure communication channels," but does not directly address what is meant by the "secure part of said computer system."

Based on the foregoing reasons, the Court declines to construe this term as proposed by either party because there is a plain meaning of "secure part of said computer system"  that is understandable by a jury.  The Court will consider further construction of this term, if necessary, at an appropriate time prior to trial.

United States District Court
Northern District of California

## V. CONCLUSION

For the reasons set forth above, the Court provides the following construction of the disputed claim terms/phrases:

| | DISPUTED CLAIM TERM/PHRASE | CONSTRUCTION |
|---|---|---|
| (1) | communication line | a communication channel over a wire or cable between a vendor and an electronic terminal over a physical communication network |
| (2) | subscriber line | a communication channel over a wire or cable that facilitates communication between a customer and a telephone company |
| (3) | wherein payment is routed to financial card gateway if a validation module invalidates the transaction | wherein payment is directed to a financial card gateway if a validation module determines that the transaction cannot be charged to the telephone bill |
| | selectively route processing of the transaction to a financial instrument gateway in the event of a validation process not validating the subscriber line | selectively direct processing of the transaction to a financial instrument gateway in the event that the transaction cannot be charged to the telephone bill |
| (4) | financial card gateway | access point through which payments can be made using a financial card |
| | financial instrument gateway | access point through which payments can be made using a financial instrument |
| (5) | automatically detecting an event indicative of an option to charge the second transaction to the user using an alternative payment method | No construction necessary |

United States District Court
Northern District of California

| | DISPUTED CLAIM TERM/PHRASE | CONSTRUCTION |
|---|---|---|
| | to detect, automatically, an event indicative of an option to charge the second transaction to the user using an alternative payment method | No construction necessary |
| (6) | billing telephone number (BTN) and BTN | telephone number billed or to be billed for the transaction |
| (7) | determine [first/second] reference subscriber data | obtain [first/second] stored data about a subscriber |
| (8) | the first reference subscriber data corresponds to the second reference subscriber data | the first reference subscriber data matches the second reference subscriber data |
| | the second subscriber data corresponding to the first reference subscriber data | the second reference subscriber data matching the first reference subscriber data |
| (9) | secure part of said computer system | No construction necessary |

The Court hereby schedules this matter for a Case Management Conference on Monday, September 16, 2013, at 2:00 p.m. in Courtroom 5.  The parties shall file an updated Joint Case Management Statement pursuant to this Court's Standing Order in Civil Cases and the Civil Local Rules.

IT IS SO ORDERED.

Date:   August 2, 2013

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California

38